**In re L. Bryson MOODY, Debtor.**

**Ford Motor Credit Company, Plaintiff,**

**v.**

**L. Bryson Moody, Defendant.**

**Bankruptcy No. 00–50114–JDW.**
**Adversary No. 01–05002A–JDW.**

United States Bankruptcy Court,
S.D. Georgia,
Waycross Division.

Oct. 5, 2001.

Kathleen Horne, Owen C. Murphy, Savannah, Georgia, for plaintiff.

William S. Orange, Brunswick, Georgia, for defendant.

## MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on Plaintiff's Complaint to Determine Dischargeability of Debt. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I). Having held a trial on this matter on August 23, 2001, and after considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

## Findings of Fact

On December 16, 1998, Coastal Lincoln Mercury, Inc. ("Coastal"), a Georgia corporation formed for the purpose of acquiring and operating a pre-existing franchise car dealership located in Brunswick, Georgia, entered into an Automotive Wholesale Plan Application for wholesale financing and security agreement ("Agreement") with Ford Motor Credit Company ("Plaintiff"). L. Bryson Moody ("Debtor") is the sole shareholder, president, and chief financial officer of Coastal. Debtor also is a certified public accountant and owns a CPA firm.

At the time of the purchase of the franchise, the previous franchisee was in an "out-of-trust" position with Plaintiff. In order to be granted the franchise, Coastal was required to pay Plaintiff the "out-of-trust" position cash shortfall left by the previous franchisee. Debtor, on behalf of Coastal and in order to be granted the franchise by the Lincoln–Mercury Division of Ford Motor Company ("Lincoln–Mercury"), made arrangements to pay the previous "out-of-trust" position cash.

Debtor, also on behalf of Coastal and also in order to be granted the franchise by Lincoln–Mercury, was required to hire an experienced general manager who had to be pre-approved by Lincoln–Mercury. Pursuant to this requirement, Debtor sought approval of one individual who was rejected by Lincoln–Mercury as unqualified for the job. Debtor, on behalf of Coastal, then hired Joey McQuaig, who was known to and whose employment was approved by Lincoln–Mercury. Debtor entrusted the day-to-day operation of the business to Mr. McQuaig. Although Debtor's CPA firm prepared and issued payroll checks to Coastal employees, Mr. McQuaig was responsible for maintaining the floorplan financing.

The Agreement facilitated a floor-plan arrangement under which Plaintiff provided Coastal with a line of credit to finance purchases of automobiles to be held by Coastal as inventory. Pursuant to the Agreement, Plaintiff held a security interest in Coastal's vehicle inventory and the proceeds from the sale of those vehicles. The proceeds of the sale were not required by any agreement to be held in segregated fund accounts. Plaintiff was aware of the fact that Coastal commingled proceeds from the sale of vehicles in its operating account. Debtor personally guaranteed all advances made to Coastal by Plaintiff pursuant to the Agreement by executing a Continuing Guaranty on December 16, 1998.

On September 1, 1999, Coastal sold a Mercury Grand Marquis from its inventory for the sales price of $25,600. The proceeds from this sale, totaling $26,300, were deposited into Coastal's operating account at First Georgia Bank on September 3, 1999. On September 1, 1999, Coastal sold a Ford F–150 truck from its inventory for the sales price of $17,120. This amount was paid by check from Glynn Teachers' Credit Union, and the check was deposited in Coastal's operating account at First Georgia Bank on September 8, 1999. On September 3, 1999, Coastal sold a 1998 Lincoln Navigator from its inventory for the sales price of $43,395. Of this amount, $41,200 was deposited into Coastal's operating account at First Georgia Bank on September 3, 1999. On September 3, 1999, Coastal sold a 1999 Lincoln from its inventory for a sales price of $36,522.10. This amount was paid in full by check from Anniston Lincoln Mercury, and the check was deposited in Coastal's operating account at First Georgia Bank On September 3, 1999, Coastal sold a 1999 Mercury Grand Prix from its inventory for the sales price of $27,215. Of this amount, $700 was deposited into Coastal's operating account

at First Georgia Bank on September 8, 1999, and an additional $13,000 was deposited in the same account on September 8, 1999.

None of the specific proceeds from the sales of the above five vehicles were ever remitted to Plaintiff by Coastal as required by the Agreement. The total amount advanced by Plaintiff to finance Coastal's purchase of these five vehicles was $142,622.70.

In the months prior to the business closing, if there were any problems with payment to Plaintiff or with inventory, Hector Soto of Plaintiff's staff had called Debtor directly to so inform him. Plaintiff performed an inventory and floor-plan check with Mr. McQuaig on Thursday, August 26, 1999. No irregularities were discovered or reported. On or about September 7 or 8, 1999, Mr. McQuaig tendered his resignation to Debtor and informed Debtor that one vehicle had been sold out of trust.

Debtor did not know any vehicles had been sold out of trust until having been informed by Mr. McQuaig. Debtor did not sign checks to or place orders from Plaintiff and had been unaware of any irregularities. As soon as Debtor was informed of the irregularities by Mr. McQuaig, he took immediate steps to respond to the problem. He began shutting down the business to prevent any further loss and immediately notified Plaintiff of the situation.

Debtor instructed the office manager to run a floor-plan check, which revealed that Coastal was out-of-trust on four vehicles

and that it owed Plaintiff approximately $100,000. Plaintiff sent a representative to Coastal on the same day it was notified of the problem and that representative was given keys to the dealership. The representative continued to operate the dealership for approximately one week while the business was winding up. During that time, customer vehicles were repaired, and a new franchisee was sought.

When Debtor and Coastal's office manager made the determination of the out-of-trust position, there was an approximate balance of $120,000 in Coastal's operating account Debtor issued a check to his father, Leonard Burton Moody, on September 9, 1999, in the amount of $37,167.52. At that time, Coastal had an inventory of used cars that were not pledged as collateral to Plaintiff.

Debtor sought and found a new franchisee who filed an application for the purchase of the Brunswick, Georgia, franchise and who presumably would have bought the franchise under the same terms and conditions as Coastal. At no time did Debtor conceal anything from Plaintiff, and Debtor always allowed Plaintiff free and unfettered access to the books and inventory of Coastal.

Plaintiff filed this adversary proceeding to determine the dischargeability of its claim under 11 U.S.C. Sections 523(a)(4) and (a)(6).

## Conclusions of Law

■ Plaintiff here is seeking to have its claim excepted from discharge under Sections 523(a)(4) and (a)(6).[1] Therefore,

1. Section 523(a) reads in pertinent part as follows: (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; [or]

. . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.CA. § 523(a)(4), (a)(6)(1993).

Plaintiff has the burden to prove his case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). As to Section 523(a)(4), there is no evidence to support a finding of nondischargeability. Plaintiff apparently realizes this as it has advanced no legal argument on this point. The Court therefore determines that Plaintiff has failed to meet its burden as to Section 523(a)(4), and now turns to Section 523(a)(6).

█ Section 523(a)(6) exempts from discharge those debts incurred as a result of "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The United States Supreme Court held that negligent and reckless injuries are excluded from the operation of Section 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 64, 118 S.Ct. 974, 978, 140 L.Ed.2d 90 (1998). To reach that holding, the Court reasoned that the word "willful" modifies injury, so that the debtor must have intended the injury; it is not enough that the debtor intended the act causing injury. *Id.* at 61, 118 S.Ct. at 977. The scope of the intent requirement has been the subject of some debate. Some courts require specific intent to inflict injuries.[2] Others accept a less stringent standard of substantial certainty that injury would result.[3] Those that allow the substantial certainty standard are split again as to whether subjective substantial certainty or objective substantial certainty applies.[4] Bankruptcy courts in the Eleventh Circuits are fractured on this issue. More than one court has gone with each of the three different constructions of *Geiger*. *See Scott*, 227 B.R. at 922 n. 5; *Tomlinson*, 220 B.R. at 137–38 (both adopting a strict intent standard); *Howard*, 261 B.R. at 521; *Vestal*, 256 B.R. at 329 (both adopting a subjective substantial certainty standard); *LaGrone*, 230 B.R. at 904; *Hollowell*, 242 B.R. at 546 (both adopting an objective substantial certainty standard). Despite the intra-circuit split, it appears that the Eleventh Circuit Court of Appeals has resolved each of these issues. *See Hope v. Walker*, 48 F.3d 1161, 1164–65 (11th Cir. 1995).

In *Walker*, the Eleventh Circuit anticipated the Supreme Court's reasoning and conclusion in *Geiger*. It examined the plain language of Section 523(a)(6) and the fact that "willful" modifies "injury." *Walker*, 48 F.3d at 1164; *Geiger*, 523 U.S. at 61, 118 S.Ct. at 977. It examined the legislative history to determine that willful means deliberate and intentional. 523 U.S. at 61 n. 3, 118 S.Ct. at 977 n. 3, 48 F.3d at 1164. In addition, the court found that the "reckless disregard" standard used by some courts was specifically overruled by the 1978 revisions to the Code, and it considered the policy of strictly construing discharge exceptions in favor of

2. *Fowler v. Jenkins (In re Jenkins)*, 258 B.R. 251, 257 (Bankr.N.D.Ala.2001); *Buchanan v. Scott (In re Scott)*, 227 B.R. 918, 922 n. 5 (Bankr.S.D.Fla.1998); *Florida Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson)*, 220 B.R. 134, 137–38 (Bankr.M.D.Fla.1998).

3. *Miller v. J.D. Abrams, Inc. (In the Matter of Miller)*, 156 F.3d 598, 604 (5th Cir.1998); *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir.1999); *Conseco v. Howard (In re Howard)*, 261 B.R. 513, 521 (Bankr.M.D.Fla.2001); *Davis v. Vestal (In re Vestal)*, 256 B.R. 326, 329 (Bankr.M.D.Fla. 2000); *First Liberty Bank v. LaGrone (In the Matter of LaGrone)*, 230 B.R. 900, 904 (Bankr. S.D.Ga.1999); *Britt's Home Furnishing, Inc. v. Hollowell (In re Hollowell)*, 242 B.R. 541, 546 (Bankr.N.D.Ga.1999).

4. *Compare Markowitz*, 190 F.3d at 460; *Howard*, 261 B.R. at 521; *Vestal*, 256 B.R. at 329 (adopting a subjective standard) *with Miller*, 156 F.3d at 604; *LaGrone*, 230 B.R. at 904; *Hollowell*, 242 B.R. at 546 (adopting an objective standard).

the debtor in order to "give effect to the fresh start policy of the Bankruptcy Code." 48 F.3d at 1164–65.

Having determined that Section 523(a)(6) "requires a deliberate or intentional injury," the court considered the scope of intent necessary. *Id.* at 1165. The Eleventh Circuit said, "[A] debtor is responsible, for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Id.* Although in discussing the formulation of this rule, the court quoted language of subjective substantial certainty,[5] the rule it announced does not contain similar language, nor in application of the standard did the court require the debtor's substantial certainty. *Id.* The Eleventh Circuit determined that the plaintiff's injury was not substantially certain because there was not "an unbroken chain of events leading from [the defendant's] intentional act to [the plaintiff's] physical injury," thus focusing on objective facts rather than the defendant's subjective belief. *Id.*

■■■ Therefore, this Court concludes that in the Eleventh Circuit, in order to satisfy the "willful" requirement, (1) the debtor must have had specific intent to inflict injury, or (2) there must be objective substantial certainty that injury was likely to result. In addition, as sole shareholder and an officer of Coastal, Debtor may be liable for a willful and malicious injury inflicted by Coastal if Debtor actively participated in the infliction of that injury. *Ford Motor Credit Co. v. Owens,* 807 F.2d 1556, 1559 (11th Cir.1987). As a result, Plaintiff's claim would be nondischargeable

in Debtor's individual bankruptcy case under Section 523(a)(6). *Id.*

■■■ In this case, Debtor was not directly involved with the day-to-day operations of the business. Although Debtor's CPA firm issued payroll checks for the employees, Mr. McQuaig was responsible for maintaining the floor-plan financing, and was thus in the best position to know of an out-of-trust position. Mr. McQuaig had been approved by Plaintiff to manage the franchise. This was not merely a rubber-stamp approval of whomever Debtor wished to hire, as Plaintiff had refused to approve Debtor's first choice for manager. Plaintiff was actively involved in overseeing the floor-plan financing with regular inspections. In fact, Plaintiff's employee had done an inspection just days before Debtor first became aware of the out-of-trust position. If Plaintiff's employee, whose job was to find irregularities, discovered no problems, then Debtor, whose expertise was in accounting, not automotive floor-plan financing, could hardly be expected to discover it. By placing responsibility for floor-plan financing with a man who had been approved by Plaintiff and submitting to regular inspections by Plaintiff, it cannot be said that Plaintiff was substantially certain to be injured by Debtor's actions.

Plaintiff argues that Debtor inflicted willful injury by writing several checks to creditors other than Plaintiff after Debtor became aware of the out-of-trust position. However, the checks were not drawn from a private trust account set up exclusively to funnel the proceeds from sales of Plaintiff's collateral. On the contrary, no such segregated account was required,

---

5. The court cited the Third Circuit case *Conte v. Gautam (In re Conte),* 33 F.3d 303, 308 (3d Cir.1994), and the Restatement (Second) of Torts section 8A for the premise that "[t]he word intent ... denote[s] that the actor desires to cause consequences of his act, or that *he believes* that the consequences are substantially certain to result from it." 48 F.3d at 1165 (alterations in original) (internal quotation marks omitted) (emphasis added).

and Plaintiff knew that Debtor commingled sale proceeds with operating funds. Because Plaintiff was aware of the commingling of funds and never required a separate account be maintained for the proceeds, it was not substantially certain that injury would occur if Debtor used the money in the account to pay creditors other than Plaintiff.

Although Debtor did not willfully injure Plaintiff or its property, Debtor could be liable if Coastal did so and if Debtor was actively involved in inflicting the injury. As discussed above, Debtor was inexperienced with automotive dealerships and entrusted the management of Coastal, and in particular the floor-plan financing, to Mr. McQuaig.[6]  Far from being an active participant in the creation of the out-of-trust position, Debtor did all he could to prevent further out-of-trust sales by notifying Plaintiff of the problem immediately, wrapping up Coastal's affairs, and turning over Coastal's operations to Plaintiff in the business's last weeks.  Therefore, regardless of whether Coastal willfully inflicted injury on Plaintiff, Debtor was not actively involved, and Section 523(a)(6) is not implicated in his personal bankruptcy pursuant to *Owens.*

Having determined that the injury to Plaintiff was not willful, the Court need not consider whether it was malicious. Plaintiff has failed to meet its burden under Section 523(a)(6).

---

6. In *Owens,* which also dealt with cars sold out of trust, the Eleventh Circuit noted that Owens had 16 years of experience with car dealerships, and "based on Owen's experience in the business, he knew or should have known that selling automobiles out of trust would result in injury to [the plaintiff]."  807 F.2d at 1558.