In re Stephen Eugene PENTON, Kathy Samille Penton[1], Debtors.

Automotive Finance Corp., Plaintiff,

v.

Stephen Eugene Penton, Defendant.

Bankruptcy No. 01–12844.
Adversary No. 01–01104A.

United States Bankruptcy Court,
S.D. Georgia,
Augusta Division.

Aug. 29, 2003.

1. At the call of this case for trial, Kathy Samille Penton was voluntarily dismissed as a defendant.

John P. Wills, Thomson, GA, for Debtor.

A. Stephenson Wallace, Augusta, GA, for Trustee.

## ORDER

JOHN S. DALIS, Chief Judge.

Automotive Finance Corporation (hereinafter "AFC") filed this adversary proceeding against Stephen Eugene Penton ("Defendant") and Kathy Samille Penton[2] to determine dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(6)[3]. The Court has jurisdiction to hear this matter as a core bankruptcy proceeding under 28 U.S.C. § 157(b)(2)(I).

According to the evidence presented at trial, the Plaintiff has carried its burden of proof to establish by a preponderance of the evidence that the debt owed to it by Defendant is excepted from discharge. The relevant facts are as follows. Car One was incorporated on or about January 24, 1997. The Debtors in the underlying Chapter 7 case, Mr. Stephen Eugene Penton, Defendant and Mrs. Kathy Samille Penton, were the President and Vice President of the corporation, respectively. Mr. Penton was the sole shareholder. Debtors were also the owners of Color Master, a corporation in the business of repairing automobiles. At the time of its incorporation, Car One's business was the wholesale buying and selling of automobiles. The business consisted of Mr. Penton purchasing slightly damaged automobiles from car rental companies. Color Master would repair the automobiles and Car One would then sell them to dealers. The companies, Car One and Color Master, operated from

2. At the call of this case for trial, Kathy Samille Penton was voluntarily dismissed as a defendant.

3. 11 U.S.C. § 523(a)(6) provides in pertinent part:

(a) A discharge under section 727... of this title does not discharge an individual debtor from any debt...
(6) for willful and malicious injury by the debtor to another entity or to the property of another entity...

the same location but maintained separate checking accounts.

On July 23, 1999 the Debtors entered into the first floor plan agreement with AFC on behalf of Car One to finance the purchase of automobiles. For such agreement, both Mr. and Mrs. Penton signed a promissory note and security agreement personally and unconditionally guaranteeing payment and performance by Car One of it's obligations to AFC. Included in the guarantee was the obligation to hold the sale proceeds of the floor planned inventory in trust for AFC and make required payments to AFC upon receipt of such proceeds. In August 1999 Car One held the first shareholders meeting and election of officers where Mr. J.J. Reedy was hired to manage the newly developed retail operation of Car One, and Mr. Penton would manage the wholesale portion and Color Master. At the meeting, Mr. Reaves was also appointed secretary and treasurer of Car One and received 10,000 shares of the company leaving Mr. Penton as the majority shareholder with 190,000 shares. Mr. Penton also invested $183,000.00 in the retail operation of the company.

On February 2, 2000, the Debtors entered into a second floor plan agreement with AFC signing a new promissory note and security agreement on terms similar to the previous one. During the period from July 1999 through August 2000 AFC and Car One continued their business relationship without default.

In August 2000, Mr. J.J. Reedy left Car One and Mr. John Jesse was hired as the new manager. Mr. Penton stated that the reason for the change in management in the retail portion of the company was because he had a "gut feeling" that something was wrong. In November 2000, Car One entered into a third floor plan agreement with AFC which was similar to the previous two. The automobiles included in this third agreement were acquired by Car One in October 2000 from a wholesale auction according to standard business practice in the industry. The company hired by AFC to conduct periodic lot checks issued the first notification of loss on December 20, 2000 which means that some of the cars for which AFC held a security interest were missing from the lot and unaccounted for. Car One was "out of trust".

The "out of trust" automobiles and money unaccounted for are:

| Stock Number | Principal |
|---|---|
| 93 | $ 6,110.00 |
| 95 | $ 4,145.00 |
| 96 | $ 3,675.00 |
| 97 | $ 7,115.00 |
| 100 | $ 4,295.00 |
| 102 | $ 6,059.30 |
| 105 | $ 3,425.00 |
| 107 | $ 3,875.00 |
| 108 | $ 5,205.00 |
| Total: | $43,904.30 |

Mr. Penton decided to close Car One in December 2000. After Car One closed, Mr. Penton moved his other business, Color Master, to a different location and renamed it Auto Color.

AFC contends that the automobiles were sold by Car One out-of-trust and that Mr. Penton is responsible. However, Mr. Penton represents that he had nothing to do with the sale or disposition of the automobiles as part of the retail portion of Car One of which he had no involvement other than as an investor and shareholder.

Mr. Penton admits that as the corporation's president, he signed all the paperwork for Car One's floor plan agreements, and signed some checks on behalf of Car One. He also admits that because both Color Master and Car One operate from the same location and that he was at Car One's place of business every day. However, he denies ever taking any role in the administration of the retail portion of the company. Mr. Penton testified that he

used Car One solely for the purpose of using it's license to purchase cars for the wholesale business, and that he left the administration of the retail portion to J.J. Reedy and then to John Jesse. Further, he denied having anything to do with the sale of the automobiles in the retail portion of Car One or with the lot checks.

AFC relies solely on 11 U.S.C. § 523(a)(6) for it's position that the debt owed by Mr. Penton is non-dischargeable. It's theory is that Mr. Penton converted the money received by Car One from the purchase of the automobiles and used the money for the benefit of his other company, Color Master.

▮ 11 U.S.C. § 523(a)(6) makes any debt for wilful and malicious injury by the debtor to another entity or to the property of another entity non-dischargeable. The injury must be willful as well as malicious. *In re Mills,* 111 B.R. 186 (Bankr.N.D.Ind. 1988). In order to except a debt from discharge under § 523(a)(6) the creditor (plaintiff) must prove by a preponderance of the evidence that:

1) the debtor injured another entity or the property of another entity;
2) the debtor's actions were deliberate and intentional; and
3) the debtor's actions were malicious.

▮ " 'Wilful' means 'deliberate and intentional' and 'malice' for purposes of § 523(a)(6) can be established by a finding of implied or constructive malice." *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257 (11 Cir.1988). In determining whether the act is "wilful", it is the intent to do the act which is the operative legal event, and not the intent to do the harm. *Zygulski v. Daugherty,* 236 B.R. 646 (N.D.Ind.1999). Neither reckless or negligent conduct can sustain a finding of non-dischargeability. *Hope v. Walker,* 48 F.3d 1161, 1163–64 (11th Cir.1995). To meet the malicious

requirement of § 523(a)(6), the debtor must be aware that his acts violated the property rights of another. *Matter of Brinsfield,* 78 B.R. 364, 365 (Bankr. M.D.Ga.1987); *In re Posta,* 866 F.2d 364 (10th Cir.1989) (To meet the malice requirement, the Court should look to whether or not the debtor knowingly and willfully disregarded the rights of the creditor.) "No showing of personal hatred, spite or ill-will is required to prove an injury malicious; it is enough that it was 'wrongful and without just cause or excuse'." *In re Lindberg,* 49 B.R. 228, 230 (Bankr.D.Mass.1985) (*quoting In re Askew,* 22 B.R. 641, 643 (Bankr.M.D.Ga. 1982), *aff'd,* 705 F.2d 469 (11th Cir.1983)). Hence, an injury is considered "willful" if it is intentional, and "malicious" if it results from an intentional or conscious disregard for one's duties. *Id.* However, if an act is willful, but injury is unintended, *i.e.,* neither desired nor in fact anticipated by the debtor, then it is excluded from § 523(a)(6). *See Kawaauhau v. Geiger,* 523 U.S. 57, 60–61, 118 S.Ct. 974, 976, 140 L.Ed.2d 90 (1998). A debtor's belief that harm is *substantially certain* to occur as a result of the voluntary act is sufficient to fall within the "willful and malicious" definition. *See Markowitz v. Campbell,* 190 F.3d 455, 464 (6th Cir.1999) (holding that "unless the actor desires to cause the consequences of his act, or believes that the consequences are substantially certain to result from it, he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)" (*citations omitted*)). The court should look to the totality of the circumstances to determine whether a debtor acted with malice. *Daugherty, supra.* Where "there is no other plausible inference" to be drawn from the facts than that a debtor had substantially certain knowledge that harm would result, then the debtor's requisite knowledge that harm will result can and should be in-

ferred. *See In re Woolley*, Ch. 7 Case No. 00–21343, Ad. No. 01–2001 (Bankr.S.D. Ga. Brunswick Division, November, 2001) (L. Davis) *citing Haemonetics Corp. v. Dupre*, 229 F.3d 1133, *available at* 2000 WL 1160447, at *2 (1st Cir.2000) (unpublished opinion). Section 523(a)(6) requires that the debt must arise out of a tort and not merely out of a breach of contract. *See In re Heilman*, 241 B.R. 137 (Bankr.D.Md. 1999).

▮ In assessing the willfulness of an act, a business person will be held to a higher standard than an ordinary individual where it is clear that the business person would be more knowledgeable of the natural consequences of his acts. *Matter of Ricketts*, 16 B.R. 833, 834–35 (Bankr. N.D.Ga.1982). It is also well established that officers and directors of a corporation will be held liable for debts of the corporation where their participation in the commission of tortuous act results in some harm to a third party and causes them to be liable to that party. *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir.1987) *(per curiam)*. The officer or director of the corporation will be held liable as actor and not corporate officer. *Id.*

▮ Bankruptcy courts have held that an individual debtor who, as an officer of a corporation, actively participates in the conversion of property which is subject to the security interest of a third party, is personally liable to the injured party and the debt is non-dischargeable pursuant to § 523(a)(6). *Owens, supra, citing Matter of Penning*, 22 B.R. 616, 619 (Bankr. E.D.Mich.1982); *In re Schwartz*, 36 B.R. 355, 359 (Bankr.E.D.N.Y.1984); *In re Nicoll*, 42 B.R. 87 (Bankr.N.D.Ill.1984). In *Owens*, the debtor was an officer, director, and majority shareholder of the corporation and had personally guaranteed a debt similar to the one in this case. The Court held Owens personally liable for the result-

ing injury to the creditor because of his official capacity with the company and his active participation in the conversion of the property. *Owens*, 807 F.2d at 1559 (holding that the evidence clearly supported the position that Owens had actively participated in the conversion because he made the decision to dispose of the automobiles and not to turn over the proceeds to FMCC). In *Owens*, the debtor was in charge of the day-to-day activities, sold automobiles without remitting the proceeds to FMCC, and transferred money from the dealership to another corporation he (the debtor) owned while failing to make any notation on the records. An officer of a corporation acts willfully if he is in control of the actions taken by the business, and "maliciously" if he is aware that these actions taken violate the property rights of another.

In order for AFC to succeed in this adversary, it must establish by a preponderance of the evidence that the Mr. Penton willfully converted AFC's collateral and that Mr. Penton was aware that his acts violated AFC's property rights causing loss. In other words, it needs to show that Mr. Penton had control of the retail portion of Car One, and that by his exercise of such control he knowingly caused injury to AFC. *Id.*

▮ First, I must decide whether AFC proved by a preponderance of the evidence that Mr. Penton was in control of the business. If Mr. Penton, as president, principal investor and majority shareholder was involved in the day-to-day operations of the business he was in control. *Owens, supra.* Even though Mr. Penton at all times has denied his involvement in the retail portion of the business, I find that the evidence establishes such involvement. Mr. Penton was the president of Car One and the majority shareholder. He kept control of the corporate check-

books, knew the cash flow of the company and was in a position to determine when the company did not have enough money to continue operating. He was involved in the process of acquiring the automobiles in the auctions and unconditionally guaranteed the debt to AFC. He was at Car One's place of business every day and knew of all activities at Car One on a day to day basis. If a car was sold he knew it. Mr. Penton claims that J.J. Reedy is responsible for the lost automobiles, but the evidence establishes that no automobiles were missing until well after J.J. Reedy's departure. Mr. Penton was involved in the day to day business operations and had control over the business. As an officer in control of the business, Mr. Penton is liable for debts of the corporation that result from the commission of a tortuous act such as a "willful and malicious" conversion that causes some injury to a third party.

Next, I must determine whether Mr. Penton's use of that control caused injury to AFC. AFC contends that Mr. Penton sold the automobiles out of trust causing it injury. In the automobile sales business, a dealer's sale of automobile inventory without paying the secured lender is known as "selling out of trust". *In re Moody*, 277 B.R. 865 (Bankr.S.D.Ga.2001). In other words, a sale out of trust is a conversion of the collateral.[4] Because it is the intention to act, and not the intention to do harm that is relevant for the "willful" prong of § 523(a)(6), a sale out of trust is a willful act. *See Daugherty, supra.* Such act will be "malicious" if a debtor consciously disregarded his duties and had substantial certain knowledge that he was violating the rights of the secured creditor.

*See Brinsfield, supra.* It is AFC's contention that Mr. Penton sold the automobiles and instead of keeping the proceeds in trust for AFC intentionally converted the proceeds for his own benefit which knowingly violating the rights of AFC.

The evidence shows that AFC advanced money to Car One for the purchase of the floor planned automobiles. These automobiles are now missing and AFC was never paid. Mr. Penton did not raise the defense of using the money for the purpose of saving the business and preventing losses to all creditors. *See Central Fidelity Bank v. Higginbotham,* 117 B.R. 211 (Bankr.E.D.Va.1990). Therefore, it is clear that the intention of the Mr. Penton was not to keep the business afloat.

In response to all of AFC's allegations Mr. Penton brings forth seven (7) arguments.

First, he argues that because AFC kept bad records of the repossession and sale of one of the automobiles previously claimed by AFC to be out of trust there exists a possibility that the same has happened with the rest of the automobiles alleged to be out of trust. This argument fails because the evidence shows that AFC's records are accurate, and the automobiles that were in fact repossessed by AFC have been excluded from this adversary. AFC is not seeking a judgment for deficiency following foreclosure of the repossessed automobiles.

Second, Mr. Penton argues that possibly another of the secured creditors took the automobiles. However, Mr. Penton did not provide any evidence showing that an-

---

**4.** Conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights. Any unauthorized act which deprives an owner of his property permanently or for an indefinite time. Unauthorized and wrongful exercise of dominion and control over another's personal property, to the exclusion of or inconsistent with rights of owner." *Blacks Law Dictionary,* 300 (5th ed.1979).

other creditor took these automobiles either before or after Car One closed operations.

Third, Mr. Penton argues that there is no proof that AFC actually lent money to Car One to purchase the automobiles, and that the documents in evidence are merely just that, documents. Mr. Penton admitted that AFC lent money to Car One to purchase automobiles. The evidence establishes that AFC paid the auction the purchase price in accordance with the floor plan agreements.

Fourth, Mr. Penton argues that J.J. Reedy has the reputation for converting money and selling out of trust and thus it may be his fault. The evidence established that there were no out of trust sales during the time J.J. Reedy was working at Car One. Car One became out of trust months after J.J. Reedy left.

Fifth, Mr. Penton argues that the lot checks are unreliable because there were lot checks conducted after the company had closed and those showed a larger amount of automobiles as being out of trust than were ultimately determined as missing. In floor plan financing of car inventory, retailers and lenders, as a uniform business practice, rely on these type of lot checks to account for inventory. Furthermore, the evidence shows that the lot checks were conducted during regular business hours at random every 3–5 weeks and no evidence suggests they were inaccurate. The large amount of automobiles reported out of trust during the months of March and April, 2001 is because Car One had closed and the automobiles reported as out of trust simply had already been repossessed and sold by AFC. Once the accounting for the repossessed automobiles was reconciled with the lot checks, the out of trust automobiles claimed in this complaint is less than what the March and April lot checks reported.

Sixth, Mr. Penton argues that the automobiles couldn't have been sold out of trust because the transaction was not contemporaneous to the purchase of the automobiles from the auction site and thus AFC did not have a purchase money security interest. A floor plan agreement is an ordinary transaction in the car sale business. The security agreement for the floor plan provides for the dealer to keep the sale proceeds in trust for the lender. Furthermore, industry practice establishes that when the dealer sells an automobile without remitting the proceeds to the secured lender he is "out of trust". *Owens, supra.* A purchase security interest is not relevant to a floor plan agreement. *See Moody, supra* (where Creditor only held a security interest in the automobile inventory and the proceeds from the sale of those automobiles).

Finally, Mr. Penton argues that there is no evidence that Car One sold the automobiles and no evidence that the Debtor willfully and maliciously converted the proceeds. AFC has shown that it held a security interest in the inventory and that a portion of the inventory and of the proceeds are gone. This occurred while Mr. Penton was in control of Car One. Considering the totality of the circumstances, *Daugherty, supra; see also Higginbotham,* 117 B.R. at 215, *citing Barclays American/Business Credit, Inc. v. Long,* 774 F.2d 875 (8th Cir.1985), the evidence is sufficient to support a finding that the Defendant knew that the automobiles were being sold and the money diverted and used it for his own benefit without maintaining a proper accounting. *See Higginbotham, supra.* Therefore, I find that Mr. Penton used his position of control to cause injury to AFC.

Having determined that Mr. Penton was in control of the retail portion of the busi-

ness and that he used such control to cause injury to AFC, I find that AFC has met it's burden of proof under 11 U.S.C. § 523(a)(6).

Accordingly, it is hereby ORDERED that the debt owed to AFC in the amount of $43,904.30 is not discharged in Mr. Penton's Chapter 7 bankruptcy case.