**In re Kenneth R. CHLEBOWSKI, Debtor.**

**Harry Ritchie's Jewelers, Inc., Plaintiff,**

v.

**Kenneth R. Chlebowski, Defendant.**

**Bankruptcy No. 699–61299–FRA7. Adversary No. 99–6156–FRA.**

United States Bankruptcy Court, D. Oregon.

March 23, 2000.

Bruce C. Moore, Eugene, OR, for plaintiff/trustee.

Deborah Posen, Eugene, OR, for defendant.

MEMORANDUM OPINION

FRANK R. ALLEY, III, Bankruptcy Judge.

Defendant, the debtor in the underlying chapter 7 case, disposed of collateral securing his debt to Plaintiff, contrary to the terms of the security agreement. Plaintiff claims in this adversary proceeding that the disposition constitutes a "willful and malicious injury" to its property interests, and is therefore excepted from discharge by 11 U.S.C. § 523(a)(6). I find for the Plaintiff.

## I. FACTS

Plaintiff is a jeweler, maintaining stores in Eugene, Oregon, and elsewhere. On March 31, 1997, Defendant entered into a "Retail Charge Agreement" with Plaintiff. The agreement allowed Defendant to establish an open account at Plaintiff's stores, and provided, in part:

8. **Security Interest.** You [Defendant] hereby grant to seller [Plaintiff] a purchase money security interest in the goods purchased hereunder which seller shall retain until the unpaid balance of each separate purchase is paid in full. Such interest shall secure the entire balance due hereunder together with all costs and expenses associated with collection of the balance due. You further agree and understand that the security interest granted herein shall remain valid and enforceable against any transferee who receives the goods by gift, sale or otherwise. Payments will be applied to earliest unpaid purchase. You will not dispose of the goods, remove them from their original location, or encumber them without our written consent, and you will protect us against all loss or damage to the goods from the time they are delivered until they are fully paid for....

Over a period of time the Defendant made several purchases, availing himself of the credit granted in the agreement. On December 21, 1997, Defendant purchased the collateral at issue in this case, a diamond set in a gold and platinum ring. The retail value of the purchase was $14,995.00; it was sold at a discount for $13,285.00. A $6,290.00 credit was given for other merchandise which was returned, for a balance of $6,995.00. A $10.00 UCC filing charge was added, yielding a total cash price of $7,005.00. With this sale the net balance on the Defendant's account was increased to $11,096.00. By the time of the Defendant's bankruptcy the principal balance had been reduced to $10,088.41.

At the time of the sale the Plaintiff issued and gave to Defendant a receipt disclosing the details set out above, including the UCC filing fee. On the reverse of the receipt was a statement that Plaintiff retained a security interest in the described goods "until the unpaid balance of such goods and merchandise is fully paid."

The ring was purchased for the purpose of confirming, in the traditional manner, Defendant's engagement. However, it was not long after the acquisition that the Defendant's matrimonial concerns were subordinated to his financial ones. Within two weeks of its acquisition, he pawned the diamond[1] for $1,500.00 in order to pay current debts, including a three month arrearage in his car payments. The ring was pawned in Everett, Washington. Under Washington law the Defendant was obliged to redeem the diamond by paying the amount of the pledge, plus interest, within 30 days of the pledge. Washington law also provides that this term may be extended by agreement between the borrower and pawnbroker. RCW 19.60.061.

The Defendant did not redeem the diamond within the 30 days provided, or seek an extension of time. He testified that he

---

1. The pawnbroker was not interested in the setting, and the Defendant had the diamond removed, and replaced by a cubic zirconium. He then delivered the ring to his fiancee (who had already seen it) without disclosing the switch. When asked why not, he stated that he did not think it was "relevant."

had made no effort to do so, but qualified that testimony by stating that the effort was not made simply because he did not have the money to redeem the diamond. He testified that he had hoped at the time to be able to do so, but the net pay from his new employment in Washington did not yield enough to allow for the redemption.

Eventually, and after the redemption period had run, the Defendant threw out the pawn ticket. He could not recall exactly where he had pawned the diamond, but was able to advise the Plaintiff's collector of the general vicinity of the pawnshop. He testified (without objection) that the collector advised him that the pawnshop previously situated at the general location has apparently closed, and that no sign of it remains.

## II. ISSUES

Plaintiff alleges that the Defendant willfully and maliciously injured its security interest by pawning the diamond and failing to redeem it. This injury, it is claimed, gives rise to a claim excepted from discharge by 11 U.S.C. § 523(a)(6) [2]. Defendant avers that he was not aware of the security interest, and therefore cannot be held to have willfully injured the Plaintiff's interests. He reasons that a person cannot willfully or maliciously injure an interest that he is not aware of. Moreover, he argues, there is no proof that he ever intended to injure the Plaintiff.

The case presents several issues. First, is the debt excepted from discharge under Code § 523(a)(6)? This requires consideration of whether the Defendant was aware of the security interest, and, if he was, whether it is necessary to find that his purpose in pawning the diamond was to injure the Plaintiff.

Second, if Defendant's disposition of the collateral did constitute a willful and mali-

cious injury under § 523, what is the extent of the Defendant's liability?

## III. DISCUSSION

### A. *Exception from Discharge*

#### 1. *Defendant's knowledge of the security agreement*

Defendant claims that he had no knowledge of the Plaintiff's security interest in the diamond. It follows, he suggests, that there was no willful injury, since one cannot be said to have intended injury to an interest he was not aware of.

The argument is academic, however, since the greater weight of the evidence establishes that the Defendant was aware of the fact that Plaintiff had rights in the diamond.

— As noted, the "Retail Charge Agreement" executed on March 31, 1997 contained a provision retaining a security interest in goods purchased under the agreement. The agreement included, in uppercase print above the signature line, an admonition not to sign the agreement before reading it. Defendant bought goods from Plaintiff on credit, pursuant to the agreement, on several occasions between March 1997 and December 1998.

— The sale memorandum included an additional statement that the goods sold were subject to a security interest.

— The Defendant executed a "UCC–1 STATE FINANCING STATEMENT STANDARD FORM" at the time he purchased the diamond. The form names the Defendant as the "debtor," and Plaintiff as the "Secured Party," and describes the diamond as "collateral."

— The sale price included a "UCC filing fee" of $10.00. A review of billing statements and sale memoranda reveals at least two other occasions in which similar charges were imposed.

---

**2.** 11 U.S.C. § 523(a) reads, in pertinent part: "A discharge under 727 . . . of this title does not discharge an individual debtor from any debt—. . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity."

■ I find that Defendant was aware of the fact that Plaintiff claimed an interest in the goods it sold to him. It is not necessary that he fully apprehended the nature of the interest, or all the terms of the security agreement. It is sufficient that he knew that the Plaintiff claimed the right to recover the goods if not paid. On the evidence before me, it is inescapable that Defendant knew at least that much.

### 2. *Defendant's infliction of the injury*

■ The diamond was pawned within two weeks of its acquisition. The testimony leads me to find that Defendant knew, at the time he bought the diamond, that his finances were in poor condition. He testified, for example, that the debts he owed at the time the diamond was pawned included more than two months of car payments. I am not persuaded by his testimony that he was surprised that his income from his new job would not be sufficient to redeem the diamond. I find that Defendant knew, given all the circumstances, that the diamond would not be redeemed, and was thus lost to him as a consequence of its being pawned. It follows that he knew that the delivery of the diamond to the pawnbroker would damage Plaintiff.

■ The fact that Defendant continued to make payments for some time after parting with the diamond does not alter the result. The conversion of the collateral is itself a palpable injury: the fact that Defendant mitigated some of the damage after the fact is immaterial.

### 3. *Willful and malicious injury*

Having established that Defendant knew of Plaintiff's interest in the diamond, and the effect of pawning it, the question is whether his act of pawning it constituted a *willful and malicious* injury to Plaintiff's interests.

That Plaintiff was injured is beyond dispute. The diamond is gone, and so is the pawnbroker. While it might be possible to track down the diamond, it will clearly take a considerable effort. The extent and measure of the injury will be discussed in more detail below. Suffice it to say at this point that Plaintiff's property interest has been damaged. The fundamental inquiry in this case is whether the damage was willfully and maliciously inflicted.

Prior to 1998 the Court of Appeals for the Ninth Circuit, in construing § 523(a)(6), held that "[w]hen a wrongful act ... done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure." *In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir.1986). Other Circuits had held that a "specific intent to injure" was required. *See, e.g., Geiger v. Kawaauhau,* 93 F.3d 443, *aff'd on rehearing* 113 F.3d 848 (8th Cir.1997). On review of this decision the Supreme Court resolved the split of authority, holding that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61–63, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). The Court went on to observe that (a)(6) calls to mind intentional torts, as opposed to negligent or reckless ones. *Id.*

Since the *Geiger* ruling, bankruptcy and appellate courts have struggled to apply it to cases in which the debtor has committed a deliberate act, known to be injurious, but without a subjective intention to cause harm. In this case, the question is whether conversion of collateral for the primary purpose of raising cash for other creditors can constitute a "willful and malicious" injury to the secured party's property under § 523(a)(6).

In *Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598 (5th Cir.1998), the Court of Appeals for the Fifth Circuit held that the debtor's misappropriation of plaintiff's trade secrets was excepted from discharge under § 523(a)(6). Addressing *Geiger,* the Court points out that, having

removed negligence and recklessness from the ambit of § 523(a)(6), the Supreme Court left three possible readings:

> The standard might be met by any tort generally classified as an intentional tort, by any tort substantially certain to result in injury, or any tort motivated by a desire to inflict injury.

*In re Miller*, 156 F.3d at 603. The Court rejected the first test, noting that "the label 'intentional tort' is too elusive to sort intentional acts that lead to injury from acts intended to cause injury." *Id.* The court concluded that the two remaining tests are both pertinent, and that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Miller*, 156 F.3d at 606. *See also In re Markowitz*, 190 F.3d 455 (6th Cir. 1999) (Claim not discharged if debtor desired to cause consequences of action, or believed that the consequences were substantially certain to result from his actions.)

The effect of the holding in *Miller* is to create an integrated standard for determining whether an act is "willful and malicious":

> Kawaauhau does not foreclose, even encourages this approach. The case never makes explicit whether it is analyzing solely the "willful" prong or the "willful and malicious" standard as a unit. Aggregating "willful and malicious" into a unitary concept might be inappropriate if the word they modified were "act," but treatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word they modify is "injury."

*Miller*, 156 F.3d at 606.

The Bankruptcy Appellate Panel for the Ninth Circuit has recently adopted the *Miller* rationale. *Baldwin v. Kilpatrick (In re Baldwin)*, 245 B.R. 131 (9th Cir. BAP 2000)[3]. In *Baldwin*, a default judg-

ment was entered on a complaint alleging that defendant had either violently battered plaintiff, or had assisted others in conducting the beating. The BAP held that it was clear that the judgment was based either on defendant's desire to injure plaintiff, or the substantial certainty that his acts would lead to injury. It followed that the bankruptcy court was correct in its decision to give the judgment preclusive effect, and to deny discharge of the claim.

Other courts have taken a different tack, arguing that "willful" and "malicious" are separate and distinct elements, and that *Geiger* should not be read as combining them. See, for example, *In re Slosberg*, 225 B.R. 9 (Bankr.D.Me.1998). There the court held that "willfulness" and "maliciousness" are separate elements of the nondischargeability claim, each of which must be satisfied. Under pre-*Geiger* law in the First Circuit the objecting creditor was required to show that the act was (1) done intentionally ("willful") and (2) committed with the purpose of causing the harm, or in circumstances in which the harm was certain, or substantially certain, to result. 225 B.R. 9, 17. The Court in *Slosberg* held that the "substantially certain to result" formulation was not overruled by *Geiger*, but included in the "willful" injury element. The same act would be deemed "malicious" if done without just cause or excuse. Thus a claim is excepted from discharge if premised on an act which (1) was intended to cause harm, or was substantially certain to do so ("willful"), and (2) was not justified under the circumstances ("malicious").

Defendant argues that *Geiger* limits application of § 523(a)(6) to instances where a defendant has a subjective intent to injure—the third alternative described in *Miller*. I disagree.

---

**3.** This case was tried on February 22, 2000. In fairness to counsel, it should be pointed out that the *Baldwin* opinion, while ordered to be published by the BAP, was not in general circulation at the time of the trial.

■ *Geiger* does not compel the result urged by Defendant. In that case the defendant, a physician, was found to have committed malpractice in his choice of treatment of plaintiff's illness. The Court's holding was that negligence alone does not authorize denial of discharge under § 523, and the case should not be read as going any further. *Miller* and *Baldwin* determined that Code § 523(a)(6), read in light of *Geiger*, establishes a single standard combining the concepts of "willful" and "malicious." Defendant's approach to Geiger would be to read the notion of malice out of the Code altogether, by allowing discharge of any claim where an actual intent to injure is absent. To do so would require the court to ignore the widely held view that the "malice" may be found either by proof of subjective intent to injure, or of deliberate acts taken despite the certainty that the injury would result. As the classic example points out, someone who fires a gun into a crowd will be deemed to have acted maliciously, even absent a specific desire to harm anyone. *See, e.g., Huntsinger v. State*, 200 Ga. 127, 133, 36 S.E.2d 92 (1945); *Pennsylvania v. Taylor*, 461 Pa. 557, 562, 337 A.2d 545, 547 (1975); *Hamilton v. Kentucky*, 560 S.W.2d 539, 542 (Ky.1977).

■ As noted, the Bankruptcy Appellate Panel for the Ninth Circuit has adopted the analytical approach set out in *Miller*. Congress established the appellate panels in order to promote uniformity of decision within the circuits. It follows that BAP precedent should be followed by Bankruptcy Courts in the absence of any contrary authority from the District Court. *In re Proudfoot*, 144 B.R. 876, 878 (9th Cir. BAP (Or.) 1992). Moreover, I believe that the formulation used in *Miller* and *Baldwin* more accurately reflects the language of § 523(a)(6) and the holding of the Supreme Court in *Geiger*. Accordingly I hold that a claim is excepted from dis-charge under Code § 523(a)(6) if it is based on an injury caused by a deliberate act of the debtor, undertaken either with a subjective motive to cause harm, or under circumstances where there is an objective and substantial certainty of harm from the act.[4]

■ When the Defendant pawned the diamond without any prospect of repayment, there was an objective substantial certainty that Plaintiff's interest in the diamond would be injured. It follows that the claim arising from the conversion is not dischargeable.

## B. *Damages*

What remains to determine is the nature and extent of the injury to Plaintiff. The Defendant's testimony reveals that the pawnshop is no longer at the location where the pawn occurred, and may well be out of business. Whether the diamond was retained by the pawnbroker, or sold to a third party, is unknown.

■ The measure of damages when collateral is converted is the retail value of the collateral at the time of the conversion. *In re Cox*, 243 B.R. 713 (Bankr.N.D.Ill. 2000). However, the amount of the claim cannot exceed the balance due on the account secured by the collateral. The undisputed testimony at trial was that the retail value of the diamond was, at the time of the conversion, around $13,280. The balance due on the account is $10,-088.41.

■ Under Washington law, a pawnbroker takes goods pledged to him subject to existing perfected security interests. See RCW 62A.9–307 (excluding pawnbrokers from the UCC definition of buyer in the ordinary course of business). Pawnbrokers are required to keep records of pledges. RCW 19.60.020. It might be possible to track down the diamond. How-

---

4. Defendant would not benefit from adoption of the standard employed by *Slosberg*. Pawning the ring was substantially certain to injure plaintiff's security interest, and was done without justification.

ever, if it is now in the hands of a good faith purchaser from the pawnbroker, the Plaintiff's right to recover it may have been defeated.[5] As things stand now, the collateral is out of the Plaintiff's reach, at least in the absence of extraordinary measures to recover it. In light of the parties' agreement, the Plaintiff should not be required to make a heroic effort to recover its collateral, or bear the risk that it has been placed in the hands of a buyer able to defeat its security interest. These burdens should rest with the Defendant. If the Defendant is able to recover the collateral, he should be able to benefit from the effort, to the extent he has actually paid Plaintiff's claim.

## IV. CONCLUSION

Defendant willfully and maliciously injured Plaintiff's security interest when he pawned the collateral with no reasonable prospect of redemption. The Plaintiff's measure of damages is the lesser of the value of the collateral or the balance of the account, in this case $10,088.41. The claim is excepted from discharge. To the extent Defendant pays the claim, he is subrogated to Plaintiff's security interest.

The foregoing constitutes the court's findings of fact and conclusions of law. Counsel for Plaintiff shall submit a form of judgment consistent with this opinion.

---

**5.** I decline to hold whether, under Washington law, a buyer from a pawnbroker may be a buyer in the ordinary course of business under the UCC. The issue is not essential to the outcome of this case, and better left to Washington's courts.