In re Charles F. TINKLER, Jr., Debtor.

Bombardier Capital, Inc., Plaintiff,

v.

Charles F. Tinkler, Jr., Defendant.

Bankruptcy No. 03–10189 DEC.
Adversary No. 3–1304 HRT.

United States Bankruptcy Court,
D. Colorado.

June 2, 2004.

Nancy D. Miller, Denver, CO, for Debtor.

Maria J. Flora, Denver, CO, for Trustee.

### ORDER

HOWARD R. TALLMAN, Bankruptcy Judge.

This case comes before the Court on Plaintiff's Amended Complaint for Determination that Debt is not Dischargeable [the "Amended Complaint"]. The matter was tried to the Court on March 29, 2004, and March 30, 2004. The Court has reviewed the evidence adduced at trial and has considered the arguments of the parties. It is now ready to rule.

Plaintiff's Amended Complaint states causes of action under 11 U.S.C. § 523 for nondischargeability of Defendant's debt to Plaintiff due to: embezzlement or larceny, § 523(a)(4); and willful and malicious injury, § 523(a)(6). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b).

### Facts

The following facts are relevant to the Court's determination of this matter:

1. Defendant Charles F. Tinker, Jr., ["Mr. Tinkler"] was President, director and sole shareholder of Grand Lake Motor Sports, Inc., a Colorado Corporation ["Grand Lake"].

2. Grand Lake was in the business of selling, renting and servicing snowmobiles, all terrain vehicles and associated recreational equipment.

3. Plaintiff, Bombardier Capital, Inc. ["BCI"], provided floor plan financing for Grand Lake's purchase of snowmobiles, sleds, repair parts, accessories and related equipment sold by Grand Lake in the ordinary course of its business.

4. On September 14, 1994, Grand Lake entered into an Inventory Security Agreement and Power of Attorney with BCI [the "Agreement"].

5. The Agreement provides generally that BCI would extend credit to Grand Lake for the acquisition of inventory and other purposes. It further provided that Grand Lake granted a security interest to BCI in all of the inventory purchased with the credit provided by BCI.

6. Grand Lake purchased snowmobiles from BCI for two distinct purposes:

   a. To resell as new machines; and

   b. To use as rental machines.

7. The Agreement specifies two payment plans: 1) Pay as Sold Plan; and 2) Scheduled Payment Plan. The Agreement provides that payment shall be made according to either or a combination of those plans, at BCI's discretion. The Scheduled Payment Plan, as described in the Agreement, contains no provision for payment of the balance due on a piece of inventory when sold.

8. Tom Stich testified on behalf of BCI. He is currently an employee of Bombardier Recreational Products, Inc., out of Sherbrooke, Quebec, and formerly, during the time period relevant to this action, he was a BCI employee. Mr. Stich testified that retail snowmobile inventory was to be paid as sold; parts and accessories were to be paid on scheduled payments; and rental machines were to be paid on scheduled payments, but the balance due on each machine was payable when sold.

9. The evidence that BCI pointed to in support of the stated payment arrangement for the rental machines was a document called a "dealer binder." Dealer binders for the 1998–1999 season and for the 1999–2000 season were introduced into evidence. Each of those documents contains language that supports Mr. Stich's interpretation of Grand Lake's payment obligation on the rental machines. The Court will not take those documents into consideration for two reasons:

   a. Neither one covers the time period at issue in this case;

   b. Both documents were prepared by Bombardier Recreational Products on behalf of Bombardier Motor Corporation of America. Both of those entities are separate and distinct from the Plaintiff seeking to enforce its security agreement in this adversary matter.

10. Mr. Tinkler is the Debtor in bankruptcy case number 03–10189 MER filed in the Bankruptcy Court for the District of Colorado on January 7, 2003.

11. BCI filed a proof of claim in Tinker's bankruptcy case in the amount of $229,521.81. Of that amount, BCI claims that the nondischargeable portion is either:

   a. $110,000.00 based upon the amount of proceeds received by Grand Lake and generated by the sale of inventory to a third party which was not turned over to BCI; or

   b. $189,000.00 based upon the value of inventory for which Grand Lake has been unable to account.

12. Between the dates of March 30, 2002, and May 13, 2002, Grand Lake sold 39 snowmobiles financed by BCI to one Tom Scheele for a total of $110,659.95. Such sales were made without the consent or knowledge of BCI.

13. On May 8, 2002, an agent of BCI performed a floor check of Grand Lake's inventory.

   a. Mr. Tinkler met with BCI's agent on that date and provided information to her for the floor check report.

   b. The floor check report contains a notation that "all rentals are now at National Snowmobile, Inc., 60001 U.S. Hwy 40, Granby, CO 80446, 970–877–1920, to be auctioned off 5–24–02;" but that nota-

tion was false at the time it was made.

c. Mr. Tinkler signed the floor check report certifying the accuracy of the information contained on the report.

14. The snowmobiles which were sold to Tom Scheele were rental units and, at the time of the May 8, 2002, floor check report, thirty-three (33) of those rental units had already been sold to Scheele.

15. There was no auction of Grand Lake's rental units on May 24, 2002, or any other date.

16. Throughout the course of the Agreement, it had been Grand Lake's practice to pay over proceeds from the sale of new snowmobiles financed by BCI at the time that the periodic floor check was performed and not at the time of each sale.

a. BCI asserts that this practice was contrary to the Agreement and asserts that the Agreement required payment to be made to BCI at the time any BCI financed snowmobile was sold.

b. BCI knew of and had complained about Grand Lake's practice.

17. It had been Grand Lake's practice in prior years to sell off its inventory of rental machines in the Spring of the year and to wait until the Fall of the same year to make payment to BCI for those units. This practice was done without BCI's knowledge or consent.

18. The condition of Grand Lake's business in the Spring of 2002 was such that Tinker knew that the business would not survive over the summer months unless the business received additional capital or relief from its debt.

19. In the Spring of 2002, Mr. Tinkler was trying to address Grand Lake's business problems:

a. By attempting to refinance a mortgage on real property to generate cash;

b. By attempting to obtain funds from investors;

c. By approaching BCI and requesting that Grand Lake's current debt be placed on an unsecured note to be paid over time so that new inventory could be purchased under the Agreement.

20. On or about May 21, 2002, BCI learned for the first time that the rental units had already been sold.

21. BCI repossessed Grand Lake's remaining inventory on June 12, 2002.

### Discussion

This action is brought to except Mr. Tinkler's debt to BCI from his bankruptcy discharge. BCI proceeds under two theories: 1) that the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) as a debt for embezzlement or larceny; or 2) that the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) as a debt for willful and malicious injury.

### Liability Against Tinkler in his Individual Capacity

The threshold issue in this case is whether Mr. Tinkler, the individual, may be held to account for the debts of Grand Lake Motor Sports, Inc. As a general rule, a corporate officer or shareholder, by virtue of that status alone is not liable for the acts or debts of the corporation. *Newport Steel Corp. v. Thompson,* 757 F.Supp. 1152, 1156 (D.Colo.1990) ("A corporation is a separate entity distinct from the individuals comprising it. Personal liability cannot be imposed on an

officer of a corporation merely because that individual is serving in such a capacity.") (citing *United States v. Van Diviner,* 822 F.2d 960, 963 (10th Cir.1987)). That is true even when the officer controls the operations of the corporation or is the sole shareholder of the corporation. The fact that Mr. Tinkler signed a personal guarantee of the corporate debt is of no relevance in this context. Non-dischargeability under § 523 is based upon the actions of the Debtor and not upon the mere fact of a personal guarantee.

If Mr. Tinkler is guilty of a wrongful act, the Court would be justified in disregarding the corporate entity to hold him accountable for his tort. But, even though there was argument to the effect that Mr. Tinkler had diverted funds from BCI's collateral to his personal use, the Court has seen no documentary evidence nor has it heard any testimony that substantiates that claim.

■ Conversely, if the corporation has committed a tort and Mr. Tinkler's individual actions, as opposed to his general corporate control, caused the corporation's tortious act, then he may be held to account. *Hoang v. Arbess,* 80 P.3d 863, 867 (Colo.Ct.App.2003) ("While an officer of a corporation cannot be held personally liable for a corporation's tort solely by reason of his or her official capacity, an officer may be held personally liable for his or her individual acts of negligence even though committed on behalf of the corporation, which is also held liable.") (citing *Snowden v. Taggart,* 91 Colo. 525, 17 P.2d 305, 307 (1932)). The Court must, therefore, determine if Grand Lake has committed a state law tort. *Wachovia Bank and Trust Co. v. Banister (In re Banister),* 737 F.2d 225 (2nd Cir.1984) (The provisions of the security agreement did not establish the creditor's right to possession of sale proceeds from yachts, therefore, it could not show

that out-of-trust sales constituted a conversion under New York state tort law.).

■ BCI claims that its collateral has been converted. "Conversion is any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another. A mere breach of contract will not support any action of trover. An action for damages for the conversion of personal property cannot be maintained unless plaintiff had a general or special property in the personalty converted, coupled with possession or the immediate right thereto." *Byron v. York Inv. Co.,* 133 Colo. 418, 296 P.2d 742, 745 (1956) (citing *Dorris v. San Luis Valley Finance Co.,* 90 Colo. 209, 7 P.2d 407, 408 (1932); *McLagan v. Granato,* 80 Colo. 412, 252 P. 348 (1927); *Lininger Implement Co. v. Queen City Foundry Co.,* 73 Colo. 412, 216 P. 527, 529 (1923)).

■ The Agreement at issue in this case is not as clear and unambiguous as it could be. By its terms, it does not establish BCI's claim that it was entitled to possession of sale proceeds immediately upon the sale of the rental machines. The Agreement sets up two different and distinct payment methods. Under the Pay as Sold method, it is quite clear that BCI is entitled to payment immediately upon the sale of an item of inventory. However, that provision is absent from the description of the Scheduled Payment Plan. The Agreement provides that payment will be made by one method or the other or a combination of the two, at BCI's option. The evidence before the Court does not establish BCI's election of the payment method to be used by Grand Lake. Therefore, the Court cannot find that the elements of conversion under Colorado law have been established under the terms of the Agreement based on Grand Lake's failure to pay over sale proceeds to BCI immediately upon the sale of rental machines.

But, notwithstanding BCI's lack of specificity in the drafting and documentation of its agreements, the Colorado version of the Uniform Commercial Code is also relevant to BCI's rights. The evidence shows that Grand Lake was in default of its payments to BCI prior to March of 2002, when it began its normal Spring sales of the rental machines. COLO. REV. STAT. § 4–9–609 gives a secured party the right of immediate possession of collateral upon default. Therefore, at the time that Grand Lake began selling the rental machines, in the Spring of 2002, BCI did have the legal right of immediate possession of its collateral. The act of selling those machines and permanently transferring their ownership does constitute an act of dominion over the rental machines in contravention of BCI's right of possession. Thus, Grand Lake did commit the tort of conversion under Colorado law based upon BCI's rights under the UCC to take possession of its collateral upon Grand Lake's default under the Agreement.

■ Mr. Tinkler testified that he arranged the sales of the rental machines to Mr. Scheele. Therefore, based upon his individual actions in causing Grand Lake to commit the tort of conversion, Mr. Tinkler may be held liable for his wrongful act, committed on Grand Lake's behalf, if the Court finds that Mr. Tinkler's acts are nondischargeable pursuant to either § 523(a)(4) or § 523(a)(6).

### 11 U.S.C. § 523(a)(4)

Section 523(a)(4) provides that "[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

BCI has specifically declined to take the position that the debt is non-dischargeable on account of fraud or defalcation while acting in a fiduciary capacity. Instead, it claims that Grand Lake's use of the sale proceeds from the rental machines for its own purposes, and its failure to immediately pay over those proceeds to BCI upon sale of those machines, constitutes embezzlement or larceny under § 523(a)(4).

■ "Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner." *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 902 (7th Cir.1991). The key difference between embezzlement and larceny is that "[l]arceny requires that the funds originally come into the Debtor's hands unlawfully." *Webber v. Giarratano (In re Giarratano)*, 299 B.R. 328, 338 (Bankr.D.Del.2003). Certainly, whatever BCI's rights may be, the proceeds from the sale of the rental snowmobiles came into Grand Lake's hands lawfully. Therefore, Larceny is not at issue.

■ "For purposes of establishing nondischargeability under section 523(a)(4), embezzlement is defined under federal common law as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir.1988) (citations omitted). "This definition breaks down into five elements: 1. Entrustment (property lawfully obtained originally); 2. Of property; 3. Of another; 4. That is misappropriated (used or consumed for a purpose other than that for which it was entrusted); 5. With fraudulent intent." *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr.D.Colo.2002). "Embezzlement, for purposes of 11 U.S.C. § 523 ... 'requires fraud in fact, involving moral turpitude or intentional wrong, rather than

implied or constructive fraud.'" *In re Black*, 787 F.2d 503, 507 (10th Cir.1986) (quoting *American Family Insurance Group v. Gumieny (In re Gumieny)*, 8 B.R. 602, 605 (Bankr.E.D.Wis.1981)).

■ By declining to take the position that its Agreement establishes an express or technical trust such that Mr. Tinkler may be held liable for fraud or defalcation in a fiduciary capacity, BCI tacitly acknowledges that the Agreement falls short of establishing such a trust relationship. Yet, curiously, BCI relies on the same Agreement, which admittedly fails to establish a trust relationship, to support its argument that the sale proceeds from the rental machines were the property of BCI, asserting that Grand Lake embezzled those sale proceeds by not turning them over.

One sentence in the Agreement states that Grand Lake is required to segregate "funds and proceeds payable to BCI ... IN TRUST for BCI separate and apart from dealer's funds." Even if this Court could find, from that single sentence, that an express trust had been created, neither the Agreement itself nor the other documentation entered into evidence allows this Court to determine what funds and proceeds were payable to BCI and when they were payable. So, even if this Court believed that some sort of trust had been created, it would be at a complete loss to identify the res of the trust from the language of the Agreement.

Furthermore, in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the Supreme Court addressed the issue of whether an auto dealer's financing arrangements with the creditor, who provided funds for the acquisition of its inventory, created a trust relationship for nondischargeability purposes. In that transaction, in addition to the note and chattel mortgage, the dealer delivered to the creditor a bill of sale and a trust receipt. The bill of sale purported to convey absolute ownership of the automobile to the creditor, *Id.* at 334, 55 S.Ct. at 154, and the trust receipt purported to provide that the dealer was holding the car in trust for the creditor. *Id.* at 330, 55 S.Ct. at 152. Nonetheless, after examining all of the documents involved in the transaction, the Court found that the creditor's interest in the automobile sold "out of trust" to be a security interest only and the obligation of the dealer to its creditor to be in the nature of a *contractual* duty rather than that of a fiduciary. *Id.* at 334, 55 S.Ct. at 154.

The Court finds that BCI's interest in the proceeds from the sale of Grand Lake's rental machines was a security interest. Such an interest does not convert those proceeds to BCI's property such that it can maintain an action for nondischargeability under § 523(a)(4) on account of embezzlement. *First National Bank v. Phillips (In re Phillips)*, 882 F.2d 302, 304–305 (8th Cir.1989) (Finds that a security interest does not rise to the level of ownership sufficient to support a claim for embezzlement).

At the close of Plaintiff's evidence, Mr. Tinkler moved this Court for a directed verdict with respect to BCI's claim under § 523(a)(4). The Court does find that BCI failed to produce evidence to support its claim that Mr. Tinkler is guilty of larceny or embezzlement under § 523(a)(4) and, consequently, the Court will grant Mr. Tinkler's motion for directed verdict as to the § 523(a)(4) claim.

### 11 U.S.C. § 523(a)(6)

Section 523(a)(6) provides that "[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for willful and malicious injury by the debtor to another entity or to

the property of another entity." 11 U.S.C. § 523(a)(6).

■■■ As discussed above, Mr. Tinkler, through his activities on behalf of Grand Lake, is responsible for a conversion of BCI's collateral. Of course, establishment of that fact is merely the beginning point of the inquiry. As Justice Cardozo wrote in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), "a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice." *Id.* at 332, 55 S.Ct. at 153.

*Willfulness Under § 523(a)(6)*

BCI must establish that the conversion of its collateral was both willful and malicious. 11 U.S.C. § 523(a)(6). In the relatively recent case of *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the Supreme Court discussed, at some length, the willfulness prong of the test for nondischargeability under § 523(a)(6). *Geiger* set forth the principle that to establish the willfulness element under § 523(a)(6) "takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.* at 61, 118 S.Ct. at 977. The actor must "intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id.* at 61–62, 118 S.Ct. at 977 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)). By way of illustration, the Court went on to describe some examples of intentional acts which cause injury which should not necessarily fall within the ambit of § 523(a)(6). The Court cited the example of an auto accident caused when a motorist makes an intentional left-hand turn without checking oncoming traffic. More significantly for commercial cases, it cited the example of a " 'knowing breach of contract' " *Id.* at 62, 118 S.Ct. at 977 (quoting *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 852 (8th Cir.1997)). It is clear then that a "knowing breach of contract," without more, does not create a debt which is nondischargeable due to willful and malicious injury under § 523(a)(6). See, also, *Davis*, 293 U.S. at 333, 55 S.Ct. at 153 ("The discharge will prevail as against a showing of conversion without aggravated features.").

There is some split of authority among the circuits as to whether a court is limited to examining a debtor's *subjective* intent or whether a court may use an *objective* standard to find the necessary intent. That issue, however, has apparently been put to rest in the Tenth Circuit. In *Miller v. Abrams (In re Miller)*, 156 F.3d 598 (5th Cir.1998), the Fifth Circuit examined the question of whether *Geiger's* requirement that the debtor must intend to injure the creditor means that a court is required to find that the debtor has a *subjective motive* to injure the creditor or if it is sufficient that the Court find an *objective substantial certainty* of harm to the creditor. That court held that "an injury is 'willful and malicious' where there is *either* an *objective substantial certainty* of harm or a *subjective motive* to cause harm." *Id.* at 606 (emphasis added). That court was concerned that "[w]hile a [subjective] standard might still have bite for judgments involving torts like battery, it would make nondischargeability unnecessarily rare, as judgments for torts substantially certain or certain to result in injury would be discharged when a tortfeasor was merely indifferent to the injury and not acting with the end goal of causing that injury." *Id.* at 605.

■■■ But, the Tenth Circuit has rejected the *Miller* objective standard in an unpublished opinion. In *Via Christi Re-*

*gional Medical Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, 2000 WL 1275614 (10th Cir.2000) (unpublished disposition), the court said "the 'willful and malicious injury' exception to dischargeability in § 523(a)(6) *turns on the state of mind of the debtor*, who must have wished to cause injury or at least believed it was substantially certain to occur." *Id.* at *3 (emphasis added). The same standard was used by the Tenth Circuit Bankruptcy Appellate Panel in *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651 (10th Cir. BAP 1999), where the court also focused on the debtor's subjective intent. That court stated "[w]illful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property. Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's ... rights and the debtor's knowledge that the conduct will cause particularized injury." *Id.* at 657.

*Malice Under § 523(a)(6)*

■ There is also confusion in the case law as to whether *Geiger* has essentially collapsed the "willful and malicious" inquiry into a unitary standard that embraces both willfulness and malice. *See, e.g., Miller*, 156 F.3d at 606 ("[*Geiger*] never makes explicit whether it is analyzing solely the 'willful' prong or the 'willful and malicious' standard as a unit. Aggregating 'willful and malicious' into a unitary concept might be inappropriate if the word they modified were 'act,' but treatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word they modify is 'injury.' "); *Harry Ritchie's Jewelers, Inc. v. Chlebowski (In re Chlebowski)*, 246 B.R. 639, 644 (Bankr.D.Or.2000) (" The effect of the holding in *Miller* is to create an inte-

grated standard for determining whether an act is 'willful and malicious.' ").

But, this Court recognizes the necessity of giving effect to the entire statute. *C.I.T. Financial Services, Inc. v. Posta (In re Posta)*, 866 F.2d 364, 367 (10th Cir.1989) ("Statutes should be construed to give effect to every word Congress has used.") (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979)). Failure to do so could lead to unintended results. If all that is necessary to establish nondischargeability is to find that a defendant inflicted an intentional injury upon a plaintiff, then an intentional injury that the law justifiably excuses in other contexts would result in a nondischargeable debt in bankruptcy court. For example, a debtor could be held liable under § 523(a)(6) on account of an injury inflicted intentionally, but in self defense. Notwithstanding the *Geiger* Court's focus upon the willfulness prong of the statute, this Court finds no indication in that discussion that it was the Supreme Court's intention to write "malicious" out of the statute. *See McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 20 (Bankr. D.Me.1998) ("*In re Geiger* should not be read to collapse the two elements into one."). In *Geiger*, the Court's finding that the debtor's action was not willful made any discussion of the malice prong unnecessary.

In *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), the Supreme Court discussed the concept of legal malice as it applies to the discharge exception for willful and malicious injury. That decision considered § 17(2) of the Bankruptcy Act of 1898, however, the relevant statutory language remains substantially unchanged in the current § 523(a)(6). In *Geiger*, Justice Ginsburg found the *Tinker* discussion to be "less than crystalline," *Geiger*, 523 U.S. at 63, 118 S.Ct. at 978, at

least with respect to the willfulness prong that the *Geiger* Court addressed. Nonetheless, the *Tinker* Court's discussion of legal malice in the dischargeability context is somewhat more enlightening. That Court specifically approved the definition of a malicious act as a "wrongful act, done intentionally, without just cause or excuse." *Tinker,* 193 U.S. at 486, 24 S.Ct. at 508 (quoting *Bromage v. Prosser,* 4 Barn. & C. 247). It also established the Supreme Court's unwillingness to require a showing of actual spite or ill will on the part of a debtor toward the specific person injured by such debtor's act. In that regard, the Court said

> It might be conceded that the language of the exception could be so construed as to make the exception refer only to those injuries to person or property which were accompanied by particular malice, or, in other words, a malevolent purpose towards the injured person, and where the action could only be maintained upon proof of the existence of such malice. But we do not think the fair meaning of the statute would thereby be carried out.

*Tinker,* 193 U.S. at 489, 24 S.Ct. at 510.

Under the *Tinker* formulation of the malice test, there are three requirements: 1) the act is wrongful; 2) the act is intentional; and 3) the act is without just cause or excuse. The common legal understanding of a wrongful act is "[a]n act taken in violation of a legal duty; an act that unjustly infringes on another's rights." BLACK'S LAW DICTIONARY 1606 (7th ed.1999). Under *Geiger,* a debtor commits a willful act if he intends to cause the injury which results from his action. This Court believes the *Geiger* standard for willfulness embraces an act which is both wrongful and intentional. For those two elements to also remain as part of the malice standard would result in an unnec-

essary overlap. As a consequence, this Court finds that the malice prong of 11 U.S.C. § 523(a)(6) is satisfied upon a showing the injury was inflicted *without just cause or excuse. See, e.g., Kuhn v. Driver (In re Driver),* 305 B.R. 266, 268 (Bankr. N.D.Tex.2003); *Johnson v. Wood (In re Wood),* 303 B.R. 370, 373 (Bankr.C.D.Ill. 2003); *Beckett v. Bundick (In re Bundick),* 303 B.R. 90, 109 (Bankr.E.D.Va.2003); *Neshewat v. Salem (In re Salem),* 290 B.R. 479, 485 (S.D.N.Y.2003); *McAlister v. Slosberg,* 225 B.R. 9, 21 (Bankr.D.Me. 1998).

*The Injury Suffered by BCI was not Willful*

At trial, the Court heard nearly two days of evidence. The vast majority of BCI's evidence related to the damages suffered by BCI. That evidence was very detailed and quite complete. While the damages issue is an essential part of BCI's case, the heart of any action under § 523(a)(6) is the debtor's intent to injure the plaintiff. It is, perhaps, an indication of the essential weakness of BCI's position, that the evidence presented at trial relating to the key issue of intent was thin at best. At bottom, this case represents a commercial contract dispute. It is not a dispute that fits comfortably into the rubric of a § 523(a)(6) dischargeability action based upon willful and malicious injury.

This Court does find that Grand Lake committed the tort of conversion and that it was the action of Mr. Tinkler which caused the conversion. But, from the circumstances of this case, the Court must also recognize that it was a conversion in only the most technical sense of the term. As noted above, under the Colorado UCC, BCI had the right to possess the rental snowmobiles at the time that Grand Lake sold them. COLO. REV. STAT. § 4–9–609. That right was based only on the default

status of the account. BCI had never sought possession on that basis.

It was Grand Lake's established practice to sell the rental machines in the Spring and to pay them off in the Fall when Grand Lake's cash-flow picked up. The record in this case does not establish Mr. Tinkler's intention to injure BCI at the time he sold the rental machines. The record does show that Mr. Tinkler actively misled BCI's floor checker during the May 8, 2002, floor check. That clearly shows that Mr. Tinkler wished to delay revealing to BCI that he had liquidated those machines. From that, the Court can easily infer that, contrary to Grand Lakes's established practice, Mr. Tinkler believed that BCI would expect to be paid for the rental units if it knew that they had been sold. But, in this case, that falls short of proving his intent to injure BCI because of the lack of clarity with respect to what BCI's payment rights were under its contract.

The BCI floor-plan Agreement is not helpful to the Court's understanding of Grand Lake's contractual obligations. The Agreement states the payment obligation in terms of alternative arrangements, but fails to specify how those alternative arrangements apply to the particular debts created under the Agreement. In that regard, it is also important to distinguish between BCI's treatment of the rental machines as opposed to the new snowmobiles held in Grand Lake's inventory for sale. There is no question that, through the parties' course of dealing, Mr. Tinkler acted under the assumption that Grand Lake had an obligation to pay off the new machines at the time they were sold. Nonetheless, Grand Lake deferred that obligation until a floor check was performed. BCI complained about, but also continued to countenance, the practice. BCI kept close tabs on the new machines. The floor checker was required to view each new machine and extract payment on-the-spot for any such machines not accounted for.

BCI's monitoring of rental machines was substantially less rigorous. BCI's floor checker would check to see if the dealer was holding a certificate of origin for each rental machine. But, there is no evidence in the record to indicate that BCI regularly asked its floor-checker to visually inspect the rental machines. Thus, it appears that BCI treated the rental machines in a manner very different from the new machines.

Even though there is no evidence in the record that BCI knew and/or approved of Grand Lake's practice with regard to selling the rental machines in the Spring and deferring payment until the Fall, the evidence does show that Grand Lake engaged in that practice with regard to rental machines for several years. If BCI had applied the same monitoring procedures to the rental machines that it did to the new snowmobiles held in Grand Lake's inventory for sale, Grand Lake's practices could hardly have escaped its notice.

BCI argues that Grand Lake must have intended to injure it because Grand Lake had no reasonable prospect for salvaging its business at the time it sold the rental machines in the Spring of 2002. Under a "reasonable man" objective standard, the Court might be inclined to agree. The evidence is clear that Grand Lake was not going to survive into the Fall of 2002 unless it received an infusion of cash. Mr. Tinkler testified as to the measures that he had undertaken to obtain the necessary cash. The Court credits Mr. Tinkler's testimony that, subjectively, he believed that he would be able to keep his business operating either by taking on an investor or by mortgaging real property.

From its current perspective, the Court finds itself naturally skeptical of the rea-

sonableness of those expectations. The question of whether or not Mr. Tinkler's expectations were reasonable is a factor the Court considers in making its determination of Mr. Tinkler's intent. Nonetheless, *Geiger* instructs that it is Mr. Tinkler's subjective intent and not the objective reasonableness of his expectations that the Court must ultimately determine. The Court has considered both the testimony as to Mr. Tinkler's efforts to obtain the cash necessary to keep his business operating and evidence concerning the objective reasonableness of Mr. Tinkler's expectation that those efforts would be successful. Even though it appears to the Court that the chances that Mr. Tinkler would be able to save his business were marginal, the Court does not doubt the sincerity of Mr. Tinkler's belief in those possibilities. Accordingly, the Court finds that Mr. Tinkler did not act with a specific intent to injure BCI by selling the rental snowmobiles and not immediately turning the sale proceeds over to BCI.

Additionally, the Court cannot determine that Mr. Tinkler willfully injured BCI based on finding that Mr. Tinkler had knowledge of BCI's rights and believed that his actions were substantially certain to injure BCI. First of all, the Court cannot say that it knows what BCI's rights were based upon the evidence presented and the form of BCI's floor plan Agreement. Even if the Court were able to more precisely determine the contours of Grand Lake's contractual obligations to BCI, the Court finds that Mr. Tinkler did not hold a subjective belief that BCI would be harmed through his actions because he

believed that his business would continue in operation and that BCI would be paid what it was owed.

The Court notes that the record is devoid of evidence that the funds derived from sale of the rental machines were used for anything other than business purposes. That fact lends support to Mr. Tinkler's position that his actions were not motivated by a desire to inflict injury upon BCI, but by a desire to keep his failing business in operation. While Mr. Tinkler's focus on keeping his business operating, as opposed to acting on the basis of malevolence toward BCI, is relevant, it is not dispositive. The dispositive issue is the lack of clarity in Grand Lake's Agreement with BCI. By reference to the Colorado U.C.C., the Court has found that BCI has suffered a legal injury. But, due to that lack of clarity, the Court cannot find that Mr. Tinkler knew that his actions were substantially certain to injure BCI.

BCI has cited the Court to a number of cases, all of which the Court has reviewed. The Appendix to this Order contains the Court's analysis of those cases.[1] Some of the cases cited by BCI do support the notion that a sale of collateral out of trust constitutes a *per-se* willful and malicious injury. But this Court cannot recognize any such *per-se* rule because such a rule would, at minimum, directly contradict *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934) ("[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances.").

---

1. The cases provided by BCI and the Court's own research, in some measure, simply serve to highlight the unsettled state of the law under § 523(a)(6), even after *Geiger*. But the Court's determination of this matter turns less on legal nuance than upon the Court's inability to say that Grand Lake owed BCI a con-

tractual obligation to pay the balance due on rental machines upon sale. Therefore, the cases cited by BCI are less relevant to the Court's determination of this matter than they might otherwise be. For that reason, the discussion of those cases is placed in the Appendix.

This case presents precisely the type of technical conversion which the Supreme Court spoke of in *Davis*. In that case, the Supreme Court addressed a dischargeability complaint under § 17(2) of the Bankruptcy Act. That section prohibited discharge of a debt for "willful and malicious injuries to the person or property of another." *Id.* at 331, 55 S.Ct. at 153. The automobile dealer violated his agreement by selling an automobile "out of trust" and without consent of the creditor, although the sale was not concealed and was made in the ordinary course of business. *Id.* at 330, 55 S.Ct. at 152. "There [was] also testimony tending to support the inference that on many other occasions cars held upon like terms had been sold without express consent and the proceeds accounted for thereafter." *Id.* At the time of the sale, the defendant informed Aetna of the transaction and promised to make payment. However, instead, he filed a bankruptcy petition and listed his debt to Aetna in his bankruptcy schedules. The Court acknowledged that the defendant had committed an act of conversion, and said that "[t]here is no doubt that an act of conversion, *if willful and malicious*, is an injury to property within the scope of this exception." *Id.* at 332, 55 S.Ct. at 153 (emphasis added). But, the Court added that

> There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

*Id.* (citations omitted).

■ As pointed out in the Appendix, some of BCI's cited authorities also support one of Mr. Tinkler's contentions that, where proceeds from collateral sold out of trust are used to sustain a debtor's business, the debtor does not possess the requisite intent to injure the creditor and his actions are not willful and malicious. But, ultimately, this Court does not reach that issue and this Order should not be read to establish that as this Court's policy. The fact that sale proceeds were used for the business as opposed to defraying personal expenses is relevant evidence, but is not dispositive. What is clear in this case is that the language used in BCI's Agreement simply undercuts any notion that Mr. Tinkler knew of BCI's rights and intentionally violated those rights when he caused Grand Lake to sell the rental machines without immediately turning sale proceeds over to BCI.

Because the Court has found that Mr. Tinkler did not willfully injure BCI, it will not discuss the malice prong of § 523(a)(6).

### Conclusion

It is easy to find that an individual has inflicted a willful injury upon another where there is evidence that such individual possessed the intention of injuring the other. In this case, Mr. Tinkler has carried on a business relationship with BCI for several years. That business represents Mr. Tinkler's livelihood. The evidence is clear that he hoped and expected to continue that business relationship into the future. Even though there is no doubt that BCI was harmed by Mr. Tinkler's actions on behalf of Grand Lake, there is also no doubt that Mr. Tinkler intended to stay in business and make payment to BCI on account of the sale of the rental units as he had done over the course of many years. The evidence before the Court does not demonstrate an intent on Mr. Tinkler's part to harm BCI.

Alternatively, the Court might also find a willful injury was inflicted if it could find that Mr. Tinkler knew that he was acting

contrary to BCI's rights and that his actions were substantially certain to harm BCI. But that alternative fails because BCI was unable to demonstrate to the Court that Mr. Tinkler, on behalf of Grand Lake, had violated any legal duty owed to BCI by failing to turn over proceeds from sale of the rental units at the time they were sold. That failure turns upon the Court's construction of the floor plan Agreement entered into between BCI and Grand Lake. As the Agreement sets out two alternative payment methods and the Court has not seen evidence of an election by BCI of how the debt generated under that agreement was to be repaid, it cannot say that Mr. Tinkler caused Grand Lake to breach a contractual duty to BCI by its failure to pay over sale proceeds from the rental machines.

Also relevant to the Court's determination is Grand Lake's long established course of dealing with respect to selling off the rental machines in the Spring and making payment in the Fall. In addition, the Court finds that proceeds from the sale of the rental machines was used for Grand Lake's business purposes as opposed to Mr. Tinkler's personal expenses. While neither one of those factors is decisive, they are consistent with a record, as a whole, that fails to demonstrate Mr. Tinkler's active intent to injure BCI or his knowledge that he was acting in such a way that would surely result in an injury to BCI. It is therefore,

**ORDERED** that Mr. Tinkler's motion for directed verdict as to BCI's First Claim for Relief (Embezzlement or Larceny, 11 U.S.C. § 523(a)(4)), is hereby GRANTED. Therefore, BCI's First Claim for Relief is dismissed at the close of Plaintiff's case; it is further

**ORDERED** that BCI's Second Claim for Relief (Willful and Malicious Injury, 11 U.S.C. § 523(a)(6)) is hereby DENIED;

therefore, all relief prayed for in Plaintiff's Amended Complaint for Determination that Debt is not Dischargeable is DENIED.

### APPENDIX

BCI has cited the Court to a number of cases in support of its position that Mr. Tinkler's actions were willful and malicious.

In *Miller v. Abrams (In re Miller)*, 156 F.3d 598 (5th Cir.1998), the Fifth Circuit examined the standard for willful and malicious injury under § 523(a)(6) in the wake of the *Geiger* decision. As noted in the body of the Order, the *Miller* objective standard has been rejected in the Tenth Circuit. Thus, the courts in this circuit must look at a debtor's subjective state of mind and not at an external objective appraisal of how such debtor's actions will affect the creditor.

BCI quotes extensively from *Automotive Finance Corp. v. Penton (In re Penton)*, 299 B.R. 701 (Bankr.S.D.Ga.2003), both for the proposition that an officer who exercises control over a company is legally responsible for any torts committed by the company and for the proposition that the sale of collateral out of trust constitutes a willful and malicious act. In the *Penton* case, the debtor owned an auto dealership and the creditor was his floor plan financier. The dealership was found to be out of trust with respect to nine vehicles which could not be located during a floor check. Shortly thereafter the debtor closed down the dealership and filed a bankruptcy petition. The creditor sought to have the debt excluded from discharge under § 523(a)(6). The court stated that the creditor could prevail if it could prove by a preponderance of the evidence that " Mr. Penton willfully converted [the creditor's] collateral and that Mr. Penton was aware that his acts violated [the creditor's] property

rights causing loss. In other words, it needs to show that Mr. Penton had control of the [auto dealership], and that by his exercise of such control he knowingly caused injury to [the creditor]." *Id.* at 705. The court ultimately found that Mr. Penton did control the auto dealership and that he used that control to cause injury to the creditor. *Id.* at 707–708.

It is quite unclear to this Court whether or not the legal standard used by the *Penton* court is similar to the controlling legal standard in this circuit. At the beginning of its discussion, that court says "it is the intent to do the act which is the operative legal event, and not the intent to do the harm." *Id.* at 704. Of course, that statement is contrary to the Supreme Court's holding in *Geiger* that nondischargeability under § 523(a)(6) "takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). Under § 523(a)(6), the actor must "intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id.* at 61–62, 118 S.Ct. at 977 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)). Although the *Penton* court discussed willfulness and malice as separate elements, at the end of its discussion, the court seemed to collapse the analysis to the question of whether the debtor "knowingly caused injury to [the creditor]." *Penton,* 299 B.R. 701 at 705. Thus, this Court is reluctant to place substantial reliance on a case from another circuit that does not clearly utilize the same legal standard required for cases in the Tenth Circuit.

More problematic for BCI are the factual differences. The *Penton* decision reflected no disagreement as to that debtor's obligations to his creditor. From the doc-umentary evidence before this Court, it is impossible to say with any confidence whether or not Grand Lake was contractually bound to make payment to BCI at the time it sold the rental machines. Furthermore, the *Penton* court specifically noted that its debtor was not making the claim that funds received from the sale of collateral were used to keep the business afloat. This Court infers from that comment, that the result may have been different if that debtor had demonstrated an intent to keep his business alive using proceeds from the collateral so that all of his debts could be paid. For these reasons, the Court can place little reliance on the *Penton* decision.

Another case relied on by BCI is *Internet Automotive Group v. Shaffer (In re Shaffer),* 305 B.R. 771 (Bankr.D.S.C.2004). That case involved a dealer who acted as a wholesale broker of automobiles for the plaintiff. Plaintiff delivered cars to defendant for sale but retained ownership of the cars. After defendant would sell the cars and turn over sale proceeds to plaintiff, then plaintiff would convey the titles to the buyers. Thus, the relationship of the parties was that of a broker to his client. The defendant sold the plaintiff's automobiles and failed to turn over the sale proceeds. The Court found the defendant liable under § 523(a)(6).

Again, in this case, there was no argument as to the broker's obligation to turn over sale proceeds to the plaintiff upon the sale of one of the plaintiff's automobiles. In our case, the precise nature of Grand Lake's contractual obligation is much less clear.

*Commerce Bank v. Hammitt (In re Hammitt),* 289 B.R. 681 (Bankr.C.D.Ill. 2001) involved debtors who operated a cattle feeding business. Commerce held a security interest in their inventory of cattle and in machinery and equipment. The business never made money and, during

the last year of operation, the Hammitts scheduled a sale of their remaining cattle. During the period leading up to that sale, the Hammitts transferred machinery, equipment and cattle subject to Commerce's security interest in return for feed, labor and services which were necessary to keep the business afloat until the sale could be held. After the sale, the Hammitts failed to pay the proceeds received over to Commerce. Two months later, one final sale was conducted of cattle belonging to Interstate Producers Livestock Association ["IPLA"]. Debtors received nothing from that final sale. The Court believes that the *Hammitt* case is more helpful to Mr. Tinkler than it is to BCI.

That court conducted two separate inquiries. First, it focused on the transfer of cattle, machinery and equipment prior to the cattle sale. The Court found the Hammitts possessed no ill will toward Commerce and that the motive of the Hammitts was to keep the business afloat long enough to conduct the sale. Therefore, as to those actions, the court did not find that the Hammitts had inflicted willful and malicious injury on Commerce. Next, the court focused on the Hammitts' diversion of proceeds from the cattle sale. At that point in time, the business was dead. Machinery and equipment previously used in the business had been traded off. All of the remaining cattle, belonging to IPLA, were to be sold two months hence. It was clear that the Hammitts were not intending to continue in the cattle business. The court noted that "the Hammitts paid $72,277.41 to a host of individuals and entities.... The bills paid included a house payment, phone bills, utilities, truck payment, credit cards, cookies, and other things." *Id.* at 686. Because the debtors could not claim that they intended to use

the money to keep the business in operation, the court found that those sale proceeds were nondischargeable under § 523(a)(6).

The primary focus of the *Hammitt* case was the debtors' motivation vis-a-vis the continued operation of the business. *Hammitt* stands for the proposition that, where the debtor's motivation in dissipating collateral is to keep the business alive, then the debtor does not possess the requisite intent to harm the creditor. Thus, even when the debtors transferred away machinery and equipment necessary to the operation of the business, they did not act willfully and maliciously because their intent was to conduct a sale that would generate proceeds with which a payment could be made to their secured creditor. But after the sale, the debtors' prospects were very different. They no longer possessed the means to continue in business. Also, much of the sale proceeds were used to pay personal expenses. Thus, no purpose was served by the use of those proceeds with respect to continuing in business.

In *Mercantile Bank v. Speers*, 244 B.R. 142 (Bankr.E.D.Ark.2000), the debtor was the sole shareholder of Woody's RV Sales, Inc. On behalf of Woody's, he agreed to take a consignment of a third party's RV for sale on his lot. Mercantile held a security interest in the RV. The debtor sold the RV and remitted none of the proceeds to either the RV's owner or to Mercantile. The sale proceeds were used both for the *debtor's personal use* and were used in the business. This is a post *Geiger* case, but the court makes no reference to *Geiger*. However, the court did cite to pre-*Geiger* 8th Circuit cases reflecting the same interpretation of § 523(a)(6) that was upheld by the Supreme Court in *Geiger*. The case contains no discussion of the evidence from which the court drew

an inference that the debtor intended to injure Mercantile. The case certainly supports BCI's position that disposal of collateral without paying proceeds to the secured creditor is willful and malicious. However, it loses persuasive quality by omitting any discussion of the debtor's intent.

In *Mabank Bank v. Grisham (In re Grisham)*, 245 B.R. 65 (Bankr.N.D.Tex. 2000), the debtors owned a cattle operation. The evidence showed that they had sold cattle with knowledge of the bank's security interest and had failed to remit proceeds of the collateral to the bank. As to the sale proceeds that were spent to defray operating expenses of the business, the court found that amount to be dischargeable under § 523(a)(6). But, as to sale proceeds for which the debtors could not account, the court inferred that those funds had been spent to defray personal expenses and, on that basis, it found the necessary intent to injure the creditor. Again, this is a case that is more supportive of Mr. Tinkler's position than of BCI's.

The case of *First Family Financial Services v. Curtis Burns*, 276 B.R. 441 (Bankr.N.D.Miss.2000), has little persuasive value. The debtor sold plaintiff's collateral without permission and without remitting sale proceeds. The court said

> The stipulated facts contained in the pre-trial order provide that Burns "sold or otherwise disposed of the property to a third party prior to the filing of this bankruptcy case." Accordingly, the court finds that the act of selling the property by the debtor was intentional and was, therefore, "willful." In addition, the stipulated facts provide that Burns "admits that the sale or transfer of the property to a third party is within the meaning of the term 'actual fraud ...'" Based on this admission, the court

finds that the debtor's act of selling the property out of trust was without just cause or excuse and was, therefore, "malicious." Burns either converted the collateral with an intent to injure or with the knowledge that an injury was substantially certain to result, thereby causing the debt to be non-dischargeable ....

*Id.* at 443. The court broke its analysis into two parts. It found willfulness based upon the fact of the sale out of trust and it based its finding of malice on the debtor's stipulation of transfer was fraudulent. With such a stipulation on the record, the case does not support the proposition that the sale of collateral out of trust, in and of itself, constitutes a willful and malicious injury.

In *Bombardier Corp. v. Penning*, 22 B.R. 616 (Bankr.E.D.Mich.1982), the defendant was a retail dealer of snowmobiles and accessories. He closed the business and was unable to account for 6 machines. That court did find that the language in the BCI contract established an express trust and, on that basis, concluded that defendant's sales out of trust constituted wilful and malicious injury. Based on the evidence in this case, this Court cannot find that BCI's contract creates anything akin to an express trust relationship. In fact, in this case, BCI withdrew the count from its complaint that alleged a breach of fiduciary duty.

*Ford Motor Credit Co. v. Branch (In re Branch)*, 54 B.R. 211 (Bankr.D.Colo.1985), bears some similarities to the present case. In that case, the Defendant was sole proprietor of a tractor dealership. Ford provided floor plan financing to the dealership. The dealership had separate and distinct arrangements with Ford with respect to tractors to be sold as new and tractors to be used as rentals. The Court found that the agreement with respect to

rental tractors was that the Defendant was obligated to make monthly payments on the machines with a balloon payment of the balance after two years. If the lessee exercised its option to purchase the tractor, the payoff balance was to be forwarded to Ford forthwith. In *Branch*, even though the dealership could not account for 29 rental tractors, the Court did not find liability under § 523(a)(6). In that case, it was clear that, when the Defendant received proceeds from the sale of a rental tractor, he was obligated to pay them over to Ford immediately. However, because the record did not establish that the Defendant had received proceeds from the sale of the rental tractors, Ford could not show that the Defendant had breached any obligation to it. Our case is *Branch* in reverse. In our case, the evidence does show that Grand Lake received proceeds from the sale of rental units. But, because documents submitted into evidence do not establish the parties' agreement, or BCI's election, of how payments were to be made with respect to which types of collateral, the Court cannot say that Grand Lake breached a contractual obligation to BCI.